IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

XEROX CORPORATION,

    *Plaintiff,*

    v.

SMS PRODUCTIONS, INC.

    *Defendant*.

Civil Action No. ELH-21-01606

**MEMORANDUM OPINION**

On June 30, 2021, plaintiff Xerox Corporation ("Xerox") filed suit against defendant SMS Productions, Inc. ("SMS"). ECF 1 (the "Complaint"). [1] The suit is rooted in SMS's alleged failure to pay contractual fees for copiers, supplies, and maintenance, in the amount of $234,397.03. ECF 1, ¶¶ 4-7. Plaintiff alleges, *inter alia*, that SMS "has been and remains in default under the terms and conditions" of two lease agreements. And, because of these defaults, "the entire outstanding principal balance remaining is accelerated." *Id.*

The Complaint contains three counts. In Count One, plaintiff alleges breach of contract with respect to two lease agreements.[2]   Count Two asserts unjust enrichment. And, Count Three alleges quantum meruit. Plaintiff claims that, "[a]s of June 17, 2021, there still remains [an] outstanding balance due by Defendant of $234,397.03, plus interest, accruing late charges, attorneys' fees, court costs and other amounts due on transactions between the parties." ECF 1, ¶ 6. Xerox also asserts that, despite its "demands upon Defendant for payment, Defendant has failed

---

[1] Jurisdiction is based on diversity of citizenship, pursuant to 28 U.S.C. § 1332(a).  *See* ECF 1, ¶¶ 1-3.

[2] Xerox actually labeled the first Count as "Count I."

and refused to pay the amounts claims [sic] herein which remain due, payable and past due." *Id.* ¶ 7.

Plaintiff was served with a summons and a copy of the Complaint on August 26, 2021. ECF 4.  But, plaintiff never responded to the Complaint. *See* Docket.

Thereafter, pursuant to plaintiff's Motion (ECF 10), the Clerk entered an "Order Of Default" on October 21, 2021. ECF 11.  The Clerk also issued a "Notice Of Default" to SMS.

On March 31, 2021, Xerox filed a "Request For Entry Of Judgment Against Defendant SMS Productions, Inc." ECF 15. The motion was supported by three exhibits. *See* ECF 15-1; ECF 15-2; ECF 15-3. Xerox requested the damages stated in the Complaint, as well as accrued interest of $52,479.25.  ECF 15-1 at 2.  Plaintiff also sought attorneys' fees in the amount of $3,187.00, pre-judgment interest, and the costs associated with this proceeding. ECF 15, ¶ 5; ECF 15 at 2.

By Memorandum Opinion and Order of June 3, 2022 (ECF 16, ECF 17), I denied the motion, without prejudice, because Xerox failed to provide the Court with adequate documentation of its two good faith attempts to serve defendant before effecting service via the Maryland State Department of Assessments and Taxation ("SDAT"). ECF 16 at 15.  In addition, Xerox failed to provide the Court with adequate documentation with respect to its request for damages.  *Id.*

Now pending is plaintiff's second motion for default judgment, pursuant to Fed. R. Civ. P. 55(b)(2).  ECF 20-1 (the "Motion").  Xerox seeks damages of $234,397.03 plus prejudgment interest of $63,686.88, for the period from December 31, 2020, to July 5, 2022, collectively totaling $298,065.91. In addition, plaintiff seeks attorneys' fees of $4,102.00 and costs.   The Motion is supported by multiple exhibits. It also includes a Certificate of Service indicating that the Motion was "served on all Parties to this case." *Id.*

SMS has not responded to the Motion, and the time to do so has expired. *See* Local Rule 105.2(a).

No hearing is required. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion, as modified.

## I.      Factual Background[3]

### A.

"On or about April 21, 2016 and August 3, 2018," Xerox agreed to provide SMS with "copiers and related equipment, supplies and maintenance in exchange for payments extending over an extended term of months." ECF 1, ¶ 4. The parties formalized their relationship in two contractual agreements. *See* ECF 1-1 (the "Lease Agreement"); ECF 1-2 (the "Maintenance Agreement"). I shall refer to ECF 1-1 and ECF 1-2 collectively as the "Leases" or the "Lease Agreements."

The Lease Agreement includes an "Order Express Cover Sheet," dated April 21, 2016. ECF 1-1 at 1. It lists the "Customer Name" as SMS and describes the "Cover Sheet Purpose" as "submitting a New Order." *Id.* SMS's delivery contact is listed as Steve Slovon. *Id.*; *see id.* at 2. The second page of the Lease Agreement provides SMS's installation and billing address as 10555 Guilford Rd., Jessup, MD 20794-9119. *Id.* at 2.

According to the Lease Agreement, SMS agreed to lease two pieces of Xerox equipment for a period of sixty months, with a "Requested Install Date" of March 28, 2016. *Id.* The equipment is identified as "XC1000I" and "EX1000I" (the "Equipment"). *Id.* The Lease Agreement also indicates a total monthly minimum payment of $3,840.71 for both the leasing and maintenance of

---

[3] I incorporate here the factual summary set forth in ECF 16.

the Equipment. ECF 1-1 at 2. Thus, over the sixty-month term, the value of the Lease Agreement was approximately $230,442.60.

The Lease Agreement provides that if SMS is "not totally satisfied with any Xerox-brand Equipment delivered under this Agreement, Xerox will, at [SMS's] request, replace it without charge with an identical model, or at Xerox's option, with Xerox Equipment with comparable features and capabilities." *Id.* at 3, ¶ 1. Further, the Lease Agreement includes a provision titled "MAINTENANCE SERVICES." *Id.* ¶ 5. It states: "Xerox (or a designated servicer) will keep the Equipment in good working order[.]" *Id.* And, if Xerox fails to do so, SMS may require Xerox, without charge, to "replace the Equipment with an identical model or, at Xerox's option, another model with comparable features and capabilities." *Id.*

In addition, the Lease Agreement specifies that it is "valid when accepted by Xerox." *Id.* at 4, ¶ 10. And, the "Term for each unit of Equipment will commence upon: (i) the delivery of customer-installable Equipment; or (ii) the installation of Xerox-installable Equipment ... and will continue for the number of full calendar months shown as 'Lease Term' on the face of this Agreement." *Id.*

The Lease Agreement contains several provisions regarding the terms according to which SMS must tender payment to Xerox. It establishes that "[p]ayment must be received by Xerox within 30 days after the invoice date." *Id.* ¶ 12. And, another provision of the Lease Agreement, titled "SEPARATELY BILLED MAINTENANCE," provides: "If a Minimum Payment is included in Maintenance Plan Features for an item of Equipment, the Minimum Payment for Maintenance Services will be billed separately." *Id.*, ¶ 11.

Under the Lease Agreement, SMS is obligated to pay late charges if payment is late. The Lease Agreement states: "If a payment is not received by Xerox within 10 days after the due date,

Xerox may charge, and you will pay, a late charge of 5% of the amount due or $25, whichever is greater." ECF 1-1, ¶ 12.

Paragraph 18 of the Lease Agreement is titled "DEFAULT & REMEDIES". *Id.* ¶ 18. It provides for a default under the Agreement based on one of two conditions. *Id.* First, it provides that SMS is in default if "Xerox does not receive any payment within 15 days after the date it is due[.]" *Id.* Second, it specifies that SMS is in default if it "breach[es] any other obligation in this or any other agreement with Xerox." *Id.*

The Lease Agreement also provides for pre-judgment interest at the rate of 1.5% per month. *Id.* Specifically, it states, *id.*:

> If you default, Xerox may, in addition to its other remedies (including cessation of Maintenance Services), remove the Equipment at your expense and require immediate payment, as liquidated damages for loss of bargain and not as a penalty, of: (a) all amounts then due, plus interest from the due date until paid at the rate of 1.5% per month; (b) the Minimum Payments (less than Maintenance Services and Consumable Supplies components thereof, as reflected on Xerox's books and records) remaining in the Term, discounted at 4% per annum; (c) the applicable Purchase Option; and (d) all applicable Taxes. You will pay all reasonable costs, including attorneys' fees, incurred by Xerox to enforce this Agreement. If you make the Equipment available for removal by Xerox within 30 days after notice of default, in the same condition as when delivered (reasonable wear and tear excepted), you will receive a credit for the fair market value of the Equipment as determined by Xerox, less any costs incurred by Xerox.

Of import here, the Lease Agreement also specifies: "This Agreement constitutes the entire agreement as to its subject matter ... and will be governed by the laws of the State of New York (without regard to conflict-of-law principles)." *Id.* ¶ 30. And, "[i]n any action to enforce this Agreement, the parties agree (a) to the jurisdiction and venue of federal and state courts in Monroe County, New York, and (b) to waive their right to a jury trial." *Id.*

The copy of the Lease Agreement submitted by Xerox is unsigned. *See* ECF 1-1. But, on behalf of SMS, the Maintenance Agreement was signed by Steven Slovon on August 3, 2018. ECF

1-2 at 2. It reflects SMS's installation and billing address as Suite G, 1340 Charwood Rd., Hanover, MD 21076-3117. *Id.*

The Maintenance Agreement appears to include information pertaining to services that Xerox subsequently provided to SMS. *See* ECF 1-2 at 1-2. It also includes an "Order Express Cover Sheet" dated August 3, 2018, which specifies the "Customer Name" as SMS. *Id.* at 1 (emphasis omitted). It indicates that the "Cover Sheet Purpose" is "submitting a New Order." *Id.*

The second page of the Maintenance Agreement provides that SMS requested maintenance for two pieces of equipment: "V3100" and "EX3100." *Id.* at 2. With respect to V3100, SMS agreed to pay a minimum monthly payment of $213.00, over a term of sixty months, totaling $12,780.00. *Id.* As to EX3100, Xerox did not charge SMS a fee. *Id.* Thus, the total value of the Maintenance Agreement was $12,780.00.

It is not clear whether the terms included in the Lease Agreement also govern the Maintenance Agreement. Pertinent here, the third page of the Maintenance Agreement appears to be a scanned version of the second page of the Lease Agreement, arguably incorporating it. *Compare* ECF 1-2 at 3 *with* ECF 1-1 at 2. However, the quality of this page is too distorted to enable the Court to evaluate its contents.

In any event, Xerox asserts: "Defendant has been and remains in default under the terms and conditions of the Leases for, among other reasons, its failure to pay the amounts due under the Lease Agreements. Because of these defaults, the entire outstanding principal balance remaining is accelerated." ECF 1, ¶ 5; *see also* ECF 1-1 at 4, ¶ 18 (specifying that in the event of default, Xerox may require, among other things "immediate payment ... of (a) all amounts then due plus interest from the due date until paid at the rate of 1.5% per month . . . .").

**B.**

Pursuant to Fed. R. Civ. P. 4(e)(1) a plaintiff may effect service on a defendant in accordance with a method permitted by State law.

On August 27, 2021, approximately two months after initiating suit, Xerox filed a document with the Court, reflecting that Xerox submitted a request to the SDAT to effect service on SMS, in accordance with State and federal law. ECF 7 (the "Acknowledgment of Service"); *see* Md. Rule 2-124(o)(iii) (permitting substituted service on a corporation or other business entity required to have a resident agent, via service on SDAT, where "two good faith attempts on separate days to serve the resident agent have failed"); *see also* Fed. R. Civ. P. 4(h)(1)(A), (e)(1) (permitting service on a corporation or other business entity by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located").

The Acknowledgment of Service is dated August 18, 2021. ECF 7 at 1. It confirms that on August 3, 2021, SDAT received a request from plaintiff to effect service on defendant. *Id.* at 1-2. It also indicates that SDAT would "forward" the relevant documents to SMS within "7 to 10 business days from receipt." *Id.* at 2 (emphasis omitted). It listed the address for SMS on Guilford Road in Jessup, Maryland, as specified in the Lease Agreement. See ECF 7 at 2; ECF 1-1 at 2. Thus, pursuant to Fed. R. Civ. P. 12(a)(1)(A), the deadline for defendant to respond to the Complaint was August 24, 2021.

However, no further action transpired in the weeks that followed. *See* Docket. Accordingly, by Order of September 9, 2021 (ECF 8), I asked plaintiff to file a status report, due by September 23, 2021.

Plaintiff responded on September 10, 2021. ECF 9. Xerox stated: "After repeated attempts to serve the Resident Agent for SMS Productions, Xerox received an Affidavit of Non-Service

from its private process server." *Id.*[4]   Accordingly, it provided SDAT with "copies of the Complaint, Summons, and accompanying exhibits" on August 3, 2021. *Id.*  And, on August 18, 2021, Xerox received the Acknowledgment of Service, which it docketed with the Court on August 27, 2021. *Id.*

Further, plaintiff stated that as of September 10, 2021, it had not "received any response from SMS Productions or a representative." *Id.*  Xerox also indicated that because SDAT stated the documents necessary to effect service would not be forwarded to SMS until "7 to 10 days from receipt", it intended to "err on the side of caution." *Id.*   Accordingly, it stated that "should no response be filed within sixty days from the date of service on SDAT (which is the time period permitted to answer in the Maryland State Courts), it [would] request a default." *Id.*; *see* Md. Rule 2-321(b)(3) ("A person who is required by statute of this State to have a resident agent and who is served with an original pleading by service upon [SDAT], . . . shall file an answer within 60 days after service.").

SMS did not respond.  Therefore, on October 21, 2021, plaintiff requested an order of default (ECF 10), which the Clerk entered on October 27, 2021.  ECF 11 (the "Order of Default"). On the same date, the Clerk mailed SMS a "Notice Of Default."  ECF 12 (the "Notice"). The Notice advised that SMS had thirty days from the date of entry of the Order to move to vacate the Order. *See id.*

The envelope containing the Notice is postmarked October 27, 2021.  ECF 13.  This is evident because it was returned to the Clerk on November 16, 2021. *Id.*  The envelope reflects that it was, indeed, sent to SMS at 10555 Guilford Rd., Jessup, MD 20794-9119, which corresponds to the address identified in the Lease for SMS. *See* ECF 1-1 at 2.  The envelope

---

[4] Xerox did not provide the Court with a copy of the Affidavit.

contains the handwritten notation: "Returned to Sender (Moved)." ECF 13. The envelope also has a yellow sticker that states: "Unable To Forward." *Id.* The first motion followed on March 31, 2022. ECF 15.

Maryland law allows a plaintiff to effect service on a corporation via substituted service on SDAT, where "two good faith attempts on separate days to serve the resident agent have failed." Md. Rule 2-124(o); *see also* Fed. R. Civ. P. 4(h)(1)(A), (e)(1) (permitting service on a corporation or other business entity by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located"). Because plaintiff failed to provide the Court with any documentation corroborating the "good faith" efforts it made to serve SMS, prior to service upon SDAT, I denied the motion. I concluded that "the unsworn contentions of plaintiff's counsel [were] insufficient to establish that it was entitled to serve SMS in this manner." ECF 16 at 15.

In support of the renewed Motion, Xerox has submitted an affidavit from the private process server, evidencing two attempts by plaintiff to effectuate service on defendant before turning to SDAT. ECF 20-2. According to the affidavit, the private process server attempted service on SMS on July 1, 2021, at 5:22 p.m., at "10555 Guilford Road, Unit 114, Jessup, MD 20794," but it was a "bad address." ECF 20-2 at 1. The server then attempted service on SMS on July 7, 2021, at 9:21 a.m., at "1340 Charwood Road, Unit G, Hanover, MD 21076." *Id.* The affidavit states: "sign on door, took pic. looked thru front door, office vacant. no desks, etc. no lights." *Id.*

After two unsuccessful attempts to serve SMS via a private process server, Xerox resorted to alternate service via SDAT. ECF 7. SDAT accepted Xerox's application and supporting affidavit on August 3, 2021. *Id.*

## II.  Legal Standards

### A.  Fed. R. Civ. P. 55

Rule 55(b) of the Federal Rules of Civil procedure governs default judgment. In particular, Rule 55(b)(1) provides that the clerk may enter a default judgment if plaintiff's claim is "for a sum certain or a sum that can be made certain by computation."[5]  But, "[a] plaintiff's assertion of a sum in a complaint does not make the sum 'certain' unless the plaintiff claims liquidated damages; otherwise the complaint must be supported by affidavit or documentary evidence." *Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 794 (D. Md. 2010) (Grimm, M.J.).[6]

Entry of default judgment under Rule 55(b)(2) "is left to the discretion of the court." *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005). But, the Fourth Circuit has a "strong policy favoring the disposition of cases on the merits...." *Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 229 (4th Cir. 2019) (discussing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)), *cert. denied*, ___ U.S. ___, 139 S. Ct. 2762, 204 L.Ed.2d 1137 (2019); *see Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 376 (4th Cir. 2013). However, the policy is not absolute. Thus, default judgment "'is appropriate when the adversary process has been halted because of an essentially unresponsive party.'" *Garnier-Thiebault, Inc. v. Castello 1935 Inc.*, SDT-17-3632, 2019 WL 6696694, at *1 (D. Md. Dec. 6, 2019) (Thacker, J.) (quoting *Int'l Painters*

---

[5]  If the sum is not certain or ascertainable through computation, the court looks to Rule 55(b)(2) ("The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter.").

[6]  Judge Grimm authored *Monge* when he served as a United States Magistrate Judge.  He now serves as a United States District Court Judge.

& *Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 684 (D. Md. 2013)); *see Lawbaugh*, 359 F. Supp. 2d at 421.

In the case of a default judgment, all of plaintiff's factual allegations, other than those pertaining to damages, are deemed admitted. *See* Fed. R. Civ. P. 8(b)(6); *see also Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (stating that the court accepts as true the well pleaded factual allegations in the Complaint as to liability). But, the court must determine whether the undisputed factual allegations constitute a legitimate cause of action. *Id.* at 780-81.

If the court is satisfied that liability has been established, it must then determine the appropriate amount of damages. *Ryan*, 253 F.3d at 780-81. Allegations "relating to the amount of damages" are not deemed admitted based on a defendant's failure to respond to a suit. Fed R. Civ. P. 8(b)(6); *see Monge*, 751 Supp. 2d at 794; *Trs. Of the Elec. Welfare Trust Fund v. MH Passa Elec. Contracting, Inc.*, DKC-08-2805, 2009 WL 2982951, at *1 (D. Md. Sept. 14, 2009) ("Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not."); *Pentech Fin. Servs., Inc. v. Old Dominion Saw Works, Inc.*, No. 6:09cv00004, 2009 WL 1872535, at *1 (W.D. Va. June 30, 2009) ("Upon default judgment, Plaintiff's factual allegations are accepted as true for all purposes excluding determination of damages.").

Rather, the court must make an independent determination regarding allegations as to damages. *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999). In so doing, the court may conduct an evidentiary hearing. Fed. R. Civ. P. 55(b)(2). However, the court may also make a determination of damages without a hearing, so long as there is an adequate evidentiary basis in the record to support an award of the requested damages. *See Adkins v. Teseo*,

180 F. Supp. 2d 15, 17 (D.D.C. 2001) ("[T]he court may rely on detailed affidavits or documentary evidence to determine the appropriate sum."); *see also Trustees of the Nat'l Asbestos Workers Pension Fund v. Ideal Insulation*, Inc., ELH-11-832, 2011 WL 5151067, at *4 (D. Md. Oct. 27, 2011) (determining that, in a case of default judgment against an employer, "the Court may award damages without a hearing if the record supports the damages requested"); *Monge*, 751 F. Supp. 2d at 795 (same); *Pentech Fin. Servs., Inc.*, 2009 WL 1872535, at *2 (concluding that there was "no need to convene a formal evidentiary hearing on the issue of damages" after default judgment because plaintiff submitted affidavits and records establishing the amount of damages); *JTH Tax, Inc. v. Smith*, Civil No. 2:06CV76, 2006 WL 1982762, at *3 (E.D. Va. June 23, 2006) ("If the defendant does not contest the amount pleaded in the complaint and the claim is for a sum that is certain or easily computable, the judgment can be entered for that amount without further hearing.").

Pursuant to Fed. R. Civ. P. 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." *See In re Genesys Data Techs, Inc.*, 204 F.3d 124, 132 (4th Cir. 2000) ("When a Complaint demands a specific amount of damages, courts have generally held that a default judgment cannot award additional damages."). This is meant to enable the defendant to decide whether to expend the resources to defend the action. *Monge*, 751 F. Supp. 2d at 796.

### B.  Choice of Law

When evaluating a state law claim brought under the Court's diversity jurisdiction, the court must apply the substantive law of the forum state, including as to choice of law. *See, e.g.*, *Nash v. Montgomery Cty.*, GJH-20-1138, 2021 WL 1222874, at *7 n.7 (D. Md. Mar. 31, 2021); *Ben-*

*Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008). Here, the forum state is Maryland.

As to contracts, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g.*, *Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). "In Maryland, choice of law provisions in contracts are enforceable unless the choice of law jurisdiction has no substantial relationship to the transaction, or there is a fundamental policy difference in the laws of another jurisdiction with a more substantial interest in the parties or the transaction." *United States for use & benefit of Tusco, Inc. v. Clark Constr. Grp.*, 235 F. Supp. 3d 745, 752 n.9 (D. Md. 2016) (citing *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 921 A.2d 799, 803-05 (2011)); *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187.

In this case, the Lease Agreement specifies that it shall be governed by New York law. ECF 1-1 at 5, ¶ 30. Plaintiff does not cite to any state law in either the Complaint or the Motion. Nor does it otherwise signal that any state law is relevant to its suit. Therefore, in the absence of any indication suggesting otherwise, I shall apply New York law in resolving the Motion.

### III.  Discussion

### A.

"It is axiomatic that service of process must be effective under the Federal Rules of Civil Procedure before a default or default judgment may be entered against a defendant." *Md. State Firemen's Ass'n v. Chaves*, 166 F.R.D. 353, 354 (D. Md. 1996). This is because, without effective

service, the court is "'without jurisdiction over the defendant.'" *Id.* (quoting *Fed. Deposit Ins. Corp. v. Spartan Mining Co., Inc.*, 96 F.R.D. 677, 680 (S.D.W.V. 1983).

As noted, under the Fed. R. Civ. P. 4(e)(1), the plaintiff may effect service in accordance with state law.  As defendant is located in Maryland, Maryland law would apply.

Pursuant to Maryland law, a plaintiff may effect service on a corporation via substituted service on SDAT, where "two good faith attempts on separate days to serve the resident agent have failed." Md. Rule 2-124(o); *see also* Fed. R. Civ. P. 4(h)(1)(A), (e)(1) (permitting service on a corporation or other business entity by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located").

Plaintiff explained in a status report dated September 10, 2021, that, "[a]fter repeated attempts to serve the Resident Agent for SMS Productions, Xerox received an Affidavit of Non-Service from its private process server." ECF 9. Xerox asserted that it had "sent copies of the Complaint, Summons, and accompanying exhibits" to SDAT, in accordance with Fed. R. Civ. P. 4(h)(1)(B) and Maryland Rule 2-124(o). ECF 9; *see* ECF 7 (Acknowledgment of Service); *see also* ECF 10, ¶ 3 ("After two good faith attempts to serve the resident agent for Defendant failed, on August 3, 2021, Defendant SMS was served by process server by delivering a copy of all filings to date to [SDAT].").

Plaintiff has submitted the affidavit of a private process server and documentation concerning two unsuccessful attempts to serve SMS.  Notably, service was attempted at two addresses used by SMS in the Leases.  After two unsuccessful attempts to serve SMS via a private process server, Xerox applied to SDAT for alternate service, and SDAT accepted Xerox's application.  ECF 7. On August 18, 2021, Xerox received the Acknowledgment of Service from SDAT, which it docketed with the Court on August 27, 2021.  *Id.*   I am satisfied that service was

effective on SMS.

**B.**

The Complaint lodges claims for breach of contract, unjust enrichment, and quantum meruit. ECF 1, ¶¶ 4-11. As to plaintiff's claim for breach of contract, New York law provides that "there are four elements to a breach of contract claim: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir. 1996).

Regarding plaintiff's claim for unjust enrichment, New York law specifies that "[t]he basis of [such a claim] is that the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732, *8-9, 967 N.E.2d 1177 (2012) (citations omitted). And, to state a claim for quantum meruit, a plaintiff must plead "'(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 509 (2d Cir. 2009) (quoting *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 175 (2d Cir. 2005) (Sotomayor, J.)).

Xerox also alleges that plaintiff and defendant entered a contract; that plaintiff complied with its obligations under the contract by providing the contracted-for items and services; and that defendant failed and refused to make full payment of the agreed upon amount. ECF 1, ¶¶ 4-6. Plaintiff's allegations are supported by copies of the contractual agreements entered by the parties. *See* ECF 1-1; ECF 1-2.

In particular, Xerox contends that, pursuant to the Lease, SMS assumed a contractual obligation to pay for the product and services in the manner and amount specified by the Lease,

but failed to comply with its contractual obligation. ECF 1, ¶¶ 4-7. Plaintiff's allegations are supported by copies of the Lease (ECF 1-1; ECF 1-2) and documentation that SMS failed to pay the sums due under the Leases. *See* ECF 1-3. And, given the posture of the case, plaintiff's allegations are deemed admitted. Fed. R. Civ. P. 8(b)(6). Thus, I am satisfied that Xerox has established SMS's liability.

Under New York law, "a claim for quantum meruit or unjust enrichment is precluded when a valid contract governing the same subject matter exists between the parties[.]" *Wilk v. VIP Health Care Services, Inc.*, 10 Civ. 5530 (ILG) (JMA), 2012 WL 560738, at *5 (E.D.N.Y. Feb. 21, 2012) (citing *Mid–Hudson Catskill Rural Migrant Ministry, Inc.*, 418 F.3d at 175); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 433 (S.D.N.Y. 2017) (explaining that unjust enrichment "'is an equitable claim that is unavailable where an adequate remedy at law exists.'") (*quoting Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010)). Therefore, my analysis is limited to the claim for breach of contract.

### C.

As to damages, Xerox asserts that, pursuant to the terms of the Lease, the defendant owes the principal balance of $234,397.03,[7] plus accrued prejudgment interest at the contractual rate of 1.5% per month through July 5, 2022. ECF 1 ¶ 8; ECF 20-1, ¶ 8. The amount is reflected on the Ledger. *See* ECF 1-2; ECF 1-3. In addition, Xerox's counsel, Donald Walsh, submitted an Affidavit (ECF 20-5) in which he avers, *id.* at 2, ¶ 6: "The amount due in these proceedings is a principal balance of $234,397.03 plus interest, for a total of $298,065.91." ECF 20-5 at 2. Plaintiff's allegations are also supported by a table calculating all unpaid invoices (ECF 20-3), and a worksheet showing the principal and accrued interest (ECF 20-4). Accordingly, I am satisfied

---

[7] This sum includes late charges, discussed earlier.

that plaintiff has adequately demonstrated that SMS is liable to plaintiff in the amount of $298,065.91.

Plaintiff also seeks "costs of this proceeding." ECF 20-1 at 3. But, Xerox does not specify the particular costs. Clearly, Xerox paid a filing fee in the amount of $402.00. *See* Docket. The filing fee incurred by plaintiff is recoverable under 28 U.S.C. § 1920(1).

In addition, the Lease states that the defendant "will pay all reasonable costs, including attorneys' fees, incurred by Xerox to enforce this Agreement." ECF 1-1 at 4. Xerox seeks legal fees in the amount of $4,102.00. Notably, when plaintiff first sought a default judgment, it requested legal fees of $3,187.00. ECF 15 at 2.

In a diversity action such as this, *see* 28 U.S.C. § 1332, a party's right to recover attorneys' fees is ordinarily governed by state law. *See Rishell v. Computer Sciences Corp.*, 702 Fed. App'x 103, 103 n.* (4th Cir. 2017); *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 451 (1st Cir. 2010); *McCollum v. State Farm Ins. Co.*, 376 Fed. App'x 217, 220 (3d Cir. 2010); *Ranger Const. Co. v. Prince William County Sch. Bd.*, 605 F.2d 1298, 1301 (4th Cir. 1979). As to the request for legal fees, I shall apply Maryland law because the lawyers are barred in Maryland, and the litigation occurred in Maryland. It would make no sense to award fees based on prevailing New York rates.

In general, Maryland follows the "American Rule," under which "a prevailing party is not awarded attorneys' fees 'unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution.' " *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 445, 952 A.2d 275, 281 (2008) (quoting *Thomas v. Gladstone*, 386 Md. 693, 699, 874 A.2d 434, 437

(2005)). "Contract provisions providing for awards of attorney's fees to the prevailing party in litigation under the contract generally are valid and enforceable in Maryland." *Myers v. Kayhoe*, 391 Md. 188, 207, 892 A.2d 520, 532 (2006); *see Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 313 (4th Cir. 2020) (same).

However, "Maryland law limits the amount of contractual attorneys [sic] fees to actual fees incurred, regardless of whether the contract provides for a greater amount." *SunTrust Bank v. Goldman*, 201 Md. App. 390, 398, 29 A.3d 724, 728 (2011). Moreover, "[e]ven in the absence of a contract term limiting recovery to reasonable fees, trial courts are required to read such a term into the contract and examine the prevailing party's fee request for reasonableness." *Myers*, 391 Md. at 207, 892 A.2d at 532; *see also Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 316, 844 A.2d 460, 478 (2004); *SunTrust*, 201 Md. App. at 401, 29 A.3d at 730 ("Current law allows a court to grant only those attorney's fees it finds reasonable."). Thus, "courts must routinely undertake an inquiry into the reasonableness of any proposed fee before settling on an award." *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325, 333, 7 A.3d 1, 5 (2010). The "reasonableness of attorney's fees is a factual determination within the sound discretion of the court." *Myers*, 391 Md. at 207, 892 A.2d at 532.

"'The burden is on the party seeking recovery to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees.'" *Ulico*, 380 Md. at 316, 844 A.2d at 478 (citation omitted). Therefore, the party seeking a fee award must provide " 'detailed records' " that specify " 'the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged.' " *Rauch v. McCall*, 134 Md. App. 624, 639, 761 A.2d 76, 84 (2000) (citation omitted), *cert. denied*, 362 Md. 625, 766 A.2d 148 (2001). "'[W]ithout such records, the reasonableness, *vel non*, of the fees can be determined only by conjecture or opinion of the attorney

seeking the fees and would therefore not be supported by competent evidence.' " *Id.* at 639, 761 A.2d at 85 (citation omitted).

Maryland courts ordinarily utilize the "lodestar" approach when determining attorneys' fees under fee-shifting statutes. *Friolo v. Frankel*, 373 Md. 501, 504-05, 819 A.2d 354, 356 (2003). However, the Maryland Court of Appeals has held that the lodestar approach is "an inappropriate mechanism for calculating fee awards" under contractual fee-shifting provisions in "disputes between private parties over breaches of contract." *Monmouth Meadows*, 416 Md. at 336, 7 A.3d at 7; *see also E. Shore Title Co. v. Ochse*, 453 Md. 303, 337, 160 A.3d 1238, 1258 (2017) (stating that the "litigation did not involve a fee-shifting statute, and therefore the lodestar method of calculation would not be appropriate"). This is because a "contractual fee-shifting provision is designed by the parties, not by the legislature.... Thus, it usually serves no larger public purpose than the interests of the parties." *Congressional Hotel Corp. v. Mervis Diamond Corp.*, 200 Md. App. 489, 505, 28 A.3d 75, 84 (2011).

In Maryland, in regard to an award based on a contract, a court "should use the factors set forth in Rule 1.5 [of the Maryland Rules of Professional Conduct ("MRPC")] as the foundation for analysis of what constitutes a reasonable fee when the court awards fees based on a contract entered by the parties authorizing an award of fees." *Monmouth Meadows*, 416 Md. at 336-37, 7 A.3d at 8.

MRPC 1.5(a) enumerates eight non-exclusive "factors to be considered in determining the reasonableness of a fee":

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.

A list of factors similar to those in MRPC 1.5 was enunciated for use in a lodestar analysis in the seminal case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). The so-called "*Johnson* factors" have been adopted for use in lodestar cases by the Fourth Circuit, see *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n. 28 (4th Cir. 1978), and in Maryland. *See Friolo*, 373 Md. at 522 n. 2, 819 A. 2d at 366 n. 2.

Cases decided under the lodestar approach can "provide helpful guidance" in contractual fee-shifting cases. *Congressional Hotel*, 200 Md. App. at 505, 28 A.3d at 85. This is because "there is likely to be some overlap between the Rule 1.5 factors and the mitigating factors typically considered in a lodestar analysis." *Monmouth Meadows*, 416 Md. at 337, 7 A.3d at 8.

"In order to apply Rule 1.5 to a fee award, a court does not need to evaluate each factor separately." *SunTrust*, 201 Md. App. at 401, 29 A.3d at 730; *see Monmouth Meadows*, 416 Md. at 337 n.11, 7 A.3d at 8 n.11. Indeed, a court need not "make explicit findings with respect to Rule 1.5" at all, or even "mention Rule 1.5 as long as it utilizes the rule as its guiding principle in determining reasonableness." *Monmouth Meadows*, 416 Md. at 340 n. 13, 7 A.3d at 10 n.13.

Moreover, when conducting an MRPC 1.5 analysis, a court "should consider the amount of the fee award in relation to the principal amount in litigation, and this may result in a downward adjustment. Although fee awards may approach or even exceed the amount at issue, the relative size of the award is something to be evaluated." *Id.* at 337, 7 A.3d at 8. And, a "trial court also may consider, in its discretion, any other factor reasonably related to a fair award of attorneys' fees." *Id.* at 337-38, 7 A.3d at 8.

This Court's Local Rules are also relevant. Local Rule 109.2(b) requires an attorneys' fees motion to be properly supported and prepared in accordance with the Court's "Rules and Guidelines for Determining Attorneys' Fees in Certain Cases," if they are applicable. *See* Local Rules App. B (the "Guidelines"). The Guidelines are applicable here, as they "apply to cases in which a prevailing party would be entitled, by applicable law or contract, to reasonable attorneys' fees...." *Id.* at 1 n.*. Among other things, the Guidelines set out mandatory rules regarding billing format and time recordation, organized by litigation phase, and require submission of quarterly statements to opposing counsel. *Id.* § 1. It also outlines non-compensable time and reimbursable expenses and sets guidelines for hourly rates for attorneys. *Id.* §§ 2-4.

Under MRPC 1.5(a)(3), a court reviewing an attorneys' fee request must consider "the fee customarily charged in the locality for similar legal services." In this inquiry, the Fourth Circuit follows the "locality rule," whereby " '[t]he community in which the court sits is the first place to look to in evaluating the prevailing market rate.' " *Montcalm Pub. Corp. v. Commonwealth of Va.*, 199 F.3d 168, 173 (4th Cir. 1999) (citation omitted). "Evidence of the prevailing market rate usually takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate. However, in the absence of sufficient documentation, the court may rely on its own knowledge of the market." *CoStar Group, Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788 (D. Md. 2000).

"In the District of Maryland, this market knowledge is embedded in the Guidelines." *Gonzales v. Caron*, CBD-10-2188, 2011 WL 3886979, at *2 (D. Md. Sept. 2, 2011). The Guidelines set forth advisory fee ranges for attorneys based on years in practice. The rates "are intended solely to provide practical guidance to lawyers and judges when requesting, challenging and awarding fees," and "may serve to make the fee petition less onerous by narrowing

the debate over the range of a reasonable hourly rate in many cases." Guidelines § 3 n.*. Although "the Guidelines are not binding, generally this Court presumes that a rate is reasonable if it falls within these ranges." *Gonzales*, 2011 WL 3886979, at *2.

The hourly rates in the Guidelines are as follows, Guidelines § 3:

a. Lawyers admitted to the bar for less than five (5) years: $ 150-225.
b. Lawyers admitted to the bar for five (5) to eight (8) years: $ 165-300.
c. Lawyers admitted to the bar for nine (9) to fourteen (14) years: $ 225-350.
d. Lawyers admitted to the bar for fifteen (15) years or more: $ 300-475.
e. Paralegals and law clerks: $ 95-150.

In support of the request for attorneys' fees, Xerox's lead counsel, Donald Walsh, submitted an Affidavit. ECF 20-5.  He also appended invoices detailing the work performed by counsel. *Id.* at 7-13.

Walsh avers that he and his associate, Morgan Dilks, performed the majority of the work for this case. *Id.* at 2.  The Affidavit states: "Through July 5, 2022 the attorneys' fees and expenses incurred in pursuing this matter total $4,102.00.  Based on my experience and the circumstances involved in these proceedings as evidenced by the filings herein to date, the amounts charged and the entire total sum in attorney's fees and costs were reasonable, fair and necessary to achieve the result obtained here. All the work performed was reasonable and necessary." *Id.*

Associate time was billed at the rate of $250.00 per hour.  Partner time was billed at a discounted rate of $300.00 per hour.  *Id.*  Additionally, Shellie L. Armiger, a paralegal working on the matter, billed at a rate of $100 per hour.  *Id.* at 12. And, paralegal Sharon S. Phillips billed at a rate of $170 per hour. *Id.* at 10.

Walsh states that he has been practicing law in Maryland for thirty years.  His rate of $300 per hour is within the Guidelines range of $300-475 for lawyers who have been admitted to the

bar for fifteen years or more. *Id.* at 1. Armiger's rate of $100 per hour is within the Guidelines range of $95-150 for paralegals and law clerks.

But, the Affidavit does not specify how long Dilks has been practicing law.  Therefore, I will assume she has been practicing law for less than five years.  For such a person, the fee range is $150-225 per hour.  This would mean that Dilks's hourly rate exceeded the top end of the range by $25 per hour.  And, Phillips's rate is $20 more per hour than the top end of the range for paralegals and law clerks.

Nevertheless, the Guidelines are not binding.  And, the Lease specifically includes an attorneys' fees provision.

According to the invoices, Dilks spent 6.2 hours working on this matter, and Walsh spent 8 hours working on the matter.  *Id.* at 7-13. Armiger spent 2.9 hours working on the matter, and Phillips spent 0.9 hours working on the matter.  *Id.* This totals $4,393.00.  But, in its Motion, plaintiff seeks only $4,102.00.

Reviewing the Rule 1.5 factors, I agree that the requested attorneys' fees are generally reasonable and appropriate. Plaintiff has supported the fee request with documentation, and the hourly rates are close to or within the applicable Guidelines range.  Furthermore, the proposed fee award is not disproportionate to the overall amount of the judgment of $298,065.91 for the defendant's failure to pay rent and accruing interest.

However, some of the work is duplicate in nature, due to the defects in the first default judgment motion.  On the other hand, some of the work in the Second Motion as not done the first time, and so it is not duplicate work.  The defendant should not be charged for the duplicate work caused by plaintiff's defects in the first motion.  Therefore, I will reduce the award of legal fees to $4,000.

Accordingly, I will grant the plaintiff's request as to attorneys' fees, as modified.

### IV.   Conclusion

In light of the foregoing, I shall grant the Motion, as modified. I shall award judgment in favor of plaintiff in the amount of $298,065.91, legal fees of $4,000, plus costs of $402.

An Order follows.

Date:   October 24, 2022

_____/s/_____
Ellen L. Hollander
United States District Judge